FILED
2012 Sep-24  AM 09:24
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## WESTERN DIVISION

| | |
|---|---|
| **R O Y   J A C K S O N ;   D E V I E McLAUGHLIN,** )<br><br>**Plaintiffs,** )<br><br>**vs.** )<br><br>**CITY OF CENTREVILLE; JULIUS DALTON MURPHY,** )<br><br>**Defendants.** ) | **CASE NO.  7:09-CV-2115-SLB** |

### MEMORANDUM OPINION

On August 16, 2012, the Magistrate Judge filed his Report and Recommendation,

(doc. 73),[1] recommending:

> (1)  The City's Motion for Summary Judgment (doc. 46) . . . be granted;

> (2)  Julius Dalton Murphy's Motion for Summary Judgment (doc. 47) . . . be granted in part and denied in part;

> (3)  The City's Motion for Summary Judgment (doc. 52) . . . be administratively terminated;

> (4)  Plaintiffs' Motion to Strike the City's "Motion for Summary Judgment (doc. 52)" (doc. 56) . . . be denied; and

> (5)  Plaintiffs' Motion to Strike the affidavit of Stephanie Scott (doc. 57) . . . be denied as moot.

(Doc. 73 at 2.)

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

Plaintiffs, Roy Jackson and Devie McLaughlin, and defendant, Julius Dalton Murphy, filed Objections to the Magistrate Judge's Report and Recommendation regarding the defendants' Motions for Summary Judgment, (docs. 76, 77); defendant, City of Centreville, filed a Response to Plaintiffs' Objections, (doc. 78).  Based upon the court's consideration of all the materials in its file, including the Report and Recommendation, the court is of the opinion that plaintiffs' Objections, (doc. 76), are due to be overruled; defendant Murphy's Objections, (doc. 77), are due to be overruled; and the Magistrate Judge's Recommendation is due to be accepted.

## I. <u>STANDARD OF REVIEW OF THE REPORT AND RECOMMENDATION</u>

The district court reviews de novo those parts of the Report and Recommendation to which a party objects.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3)("The district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to.").   The court may review the other parts of the Report and Recommendation for plain error or manifest injustice.  *United States v. Slay*, 714 F.2d 1093, 1095 (11th Cir. 1983)(citing *Nettles v. Wainwright*, 677 F.2d 404, 410 (11th Cir. 1982)). "The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions." Fed. R. Civ. P. 72(b)(3).

## II.  <u>STATEMENT OF FACTS</u>

The parties do not dispute the Magistrate Judge's determination of the facts. Therefore, the court **ADOPTS** the facts, set forth below, from the Magistrate Judge's Report and Recommendation.

This case involves actions by the Mayor of the City of Centreville, Defendant Murphy, and the City itself that were allegedly racially discriminatory towards Plaintiffs, two African-American men who worked for the City's Street Department.  The facts in this case are voluminous.  The court will first begin by discussing the structure of the City.  Next, the court will address Defendant Murphy's terms as Mayor of the City.  Finally, the court will discuss Plaintiffs' employment with the City, including the incident that resulted in Plaintiffs being fired and the events that later led to their reinstatement.

### A. The City of Centreville

The City of Centreville is a Class 8 municipality with a Mayor-Council form of government.  [(Doc. 46-4 at 2.)]  The council has five elected members that serve as both legislators and as the check and balance for the elected Mayor.  (*Id*.)  In addition to the City itself, Centreville also has a separate Water Works and Sewer Board (the Water Board).  [(Doc. 62-1 at 1-2.)]  The Water Board is a public corporation formed "pursuant to the provisions of Act No. 175 enacted at the 1951 Regular Session of the Legislature of Alabama," which is codified, among other places, at Alabama Code § 11-50-313.  [(Doc. 62-2 at 1.)]  Both the City and the Water Board are housed in the same building.  [(Doc. 62-3 at 2.)]  However, the Water Board maintains a separate payroll and has separate employees.  [(Doc. 62-1 at 2.)]  During the period at issue in this case, Defendant Murphy served as both the Mayor of the City and the Supervisor of the Water Board.  [(Doc. 48-1 at 4, 13.)]  In his deposition, Defendant Murphy noted that "the Council always appoints the Mayor as Supervisor of the Water Department."  (*Id*. at 13).  As compensation for these roles, Defendant Murphy received $400 per week from the City and $500 per month from the Water Board.  (*Id*.)  This was paid in two separate checks.  (*Id*.)

One of the City's departments is the Street Department. (*Id*. at 7). During the relevant time period there were four people employed as laborers in the Street Department:  Plaintiff Jackson, Plaintiff McLaughlin, David Crews, and Jeremy Kerr. [(Doc. 62-3 at 2-3.)] Jackson, McLaughlin, and Crews are all African American while Kerr is Caucasian.

When new Street Department employees were hired, City Clerk Stephanie Scott was responsible for their orientations. [(Doc. 48-10 at 4.)] During that orientation Ms. Scott went over the benefits package with the employees and gave employees a copy of the Handbook. (*Id*. at 4, 22). The employee handbook includes a provision addressing racial discrimination which provides:

> The City of Centreville is an equal opportunity employer and all applications for employment will be selected on the basis of qualification for the job, without regard to or discriminate on account of race, religion, color, sex, creed, handicap, age, or national origin. These principles of non-discrimination will apply to pay, promotion, and all conditions of employment.

[(Doc. 46-17 at 2.)] While the handbook includes the procedure an employee should follow to report sexual harassment, there is no such procedure for suspected race discrimination. (*Id*. at 4)("The City of Centreville will not tolerate sexual harassment of any form. Any employee that has a complaint should contact the Mayor."). In fact, the evidence in the Rule 56 record shows different theories on the proper policy for reporting potential racial discrimination. [(*Compare* doc. 46-2 at 11-14 *with* doc. 54 at 9-10.)]

## B.  Mayor Murphy

### 1. Murphy's Responsibilities as Mayor

Defendant Murphy served as the Mayor of Centreville in two non-consecutive terms [–] [f]irst from 1992 to 1996 and later from 2004 to 2008. [(Doc. 48-3 at 2.)] As Mayor, Defendant Murphy was responsible for overseeing the various departments of City Government. (*Id*.) One such department was the Street Department. (*Id*. at 3).  As part of that responsibility, he oversaw employees and made employment recommendations to the City Council. (*Id*. at 2-3).  Any recommendation Defendant Murphy made could be denied, accepted, or modified by the City Council. (*Id*.)

4

Murphy contends that he had no authority to effectuate a raise or any other employment decision without final approval by City Council. [(Doc. 49 at 6.)] However, Plaintiffs contend that Defendant Murphy made employment decisions without approval of City Council.   [(Doc. 54 at 54-55.)] Specifically, Plaintiffs point to evidence in the record that shows that Murphy notified the City Council about hiring decisions, but did not necessarily seek formal approval or those decisions. [(*Compare* doc. 55-2 and doc. 55-5 *with* doc. 55-3 and doc. 55-4.)]  For example, on January 5, 2006, the City Clerk submitted an enrollment form for the Employees' Retirement System of Alabama that shows Chris White making $10.00/hour.  (Doc. 55-2 at 5).  It is not until almost two weeks later that the City Council Minutes reflect that "[t]he Mayor told the council that he has hired a new employee for the Street Department.  His name is Chris White and his start date was January 4, 2006." (Doc. 55-3 at 3).  Notably, there is no record of any discussion concerning White's pay before the City Council.

## 2.  Racial Incidents Involving Mayor Murphy

While Defendant Murphy was Mayor, he regularly used racist terms in the work environment. [(Doc. 48-10 at 11.)]  Further, two members of the City Council reported hearing Murphy both use the "N" word and make reference to Klu Klux Klan meetings.  [(Doc. 48-11 at 16-19; doc. 48-14 at 5, 26.)] Jackson described an incident when he and his girlfriend, Misty Salter were putting in a foundation for Murphy's son's air conditioning unit and Murphy told him to "hurry up because he's got a Klan meeting to go to." [(Doc. 46-21 at 16; doc. 48-9 at 98.)]  Jackson understood Murphy to mean a KKK meeting, but did not ask for clarification about what Murphy meant. [(Doc. 46-21 at 16-17.)]  In a separate incident, Jackson was cleaning up a caboose and a man came and asked Murphy if he was going to write KKK on the side of it.  (*Id*.) Jackson testified that Murphy laughed and said "we don't need to put that on there right now." (*Id*. at 17-18).  He also testified to an incident ten to thirteen years ago when Jackson saw Murphy, prior to when Murphy was mayor, dressed in a Klan outfit at a local park.  (*Id*. at 18).

With respect to racial incidents directed at Plaintiffs, Murphy called Plaintiffs and the other African-American employees "boy", but called the white employees by their names.  [(*Id*. at 20; doc. 48-5 at 32, 36; doc. 48-11 at 22-23.)]  According to Jackson, Murphy has called him boy several times, including the day he was leaving. [(Doc. 46-21 at 21 ("The day he got out of the Mayor's seat, came out to the shop and said, I'll see y'all boys later.  But

I can't call y'all boys no more.").)]  However, the number of times Murphy called Jackson boy couldn't have been more than five times.  (*Id*. at 36).

During the September 2, 2008, City Council meeting, while discussing the incident related to Plaintiffs' termination, the minutes reflect the following incident:

> The mayor stated that while this topic was being discussed he wanted to address the situation and ask why it was turned into a racial matter. Don Mack stated that he never said it was racial.  Linda Renn Pierce admitted she thought it was racial because the Mayor is constantly making remarks about attending his Ku Klux Klan meetings and using the "N" word.  At this point the Mayor told Linda that maybe he needed to burn a cross in her yard.  Linda Renn Pierce let it be known that she took that comment as a threat.

[(Doc. 55-13 at 3.)]

## C.  Roy Jackson and Devie McLaughlin's Employment in the City's Street Department

### 1.  Roy Jackson

Roy Jackson graduated high school in 1989 and went to work for the City of Centreville that year as a laborer on a garbage truck.  [(Doc. 48-4 at 8-9.)]  In 2000, garbage collection was privatized and Jackson's position was terminated.  (*Id*. at 9).  At that time, he began to work for the ball park as a laborer.  (*Id*.)  Around 2005, Defendant Murphy sent two people to ask Jackson to return to the City to work for the street department.  (*Id*. at 11).  When he returned to work for the City, he was paid "a little more than six dollars" an hour.  (*Id*. at 10-11).  At that time, Jackson worked under Mr. Avery and Mr. Gleaton (Jackson testified that Mr. Avery handed out the job assignments).  (*Id*.)  Over the next few years, he received several pay raises: on September 15, 2006, the Mayor increased his pay to $7.00 per hour, on August 3, 2007, the Mayor increased his pay to $7.50 per hour, on October 16, 2007, he received a cost of living raise to $7.80 per hour, on March 4, 2008, he received a merit raise to $8.25 per hour, and on November 1, 2008, he received a cost of living raise to $8.58 per hour.  [(Doc. 46-16 at 2.)]

Jackson testified that he has held the role of Street Superintendent. However, Murphy asserts that when there was a lapse of time between Street

Superintendents, he served as the Street Superintendent and oversaw the work of the street department laborers. [(Doc. 48-3 at 3.)] Whether Jackson was ever Street Superintendent is a fact that is highly contested by the parties. However, at summary judgment the court must take the facts in the light most favorable to the Plaintiffs. Jackson has offered the following evidence as support for the fact that he acted as Street Superintendent. Jackson testified that the mayor told him he was the Street Superintendent. [(Doc. 48-4 at 35-36.)] According to Jackson, he became Street Superintendent after Randy Hudgins left. (*Id*. at 46-47). However, Jackson acknowledges there are no documents that show that Murphy ever made him Street Superintendent. [(Doc. 46-21 at 62.)] Further, there is testimony from others that Jackson acted as Street Superintendent. [(Doc. 48-11 at 49-50; doc. 48-15 at 5; doc. 48-10 at 15; doc. 48-9 at 16.)]

In April 2008, there was an incident with Ms. Freeman (a woman who works at City Hall). [(Doc. 48-4 at 20.)] While Jackson, McLaughlin, and Crews were working outside of City Hall, Ms. Freeman was sprayed with water. (*Id*.) According to Jackson, Ms. Freeman told Murphy that Jackson had sprayed her. (*Id*.) After telling Murphy that he had not sprayed Ms. Freeman, Jackson went to talk to Ms. Freeman. (*Id*.)("You know, when I got ready to go in there to talk to her, but I didn't go all the way in, I had got so frustrated. I told her she was wrong, you [are] wrong for telling the Mayor, that I'm disturbed, on me, about I sprayed you."). Jackson then went back into Murphy's office where Murphy told him that his anger was going to get the best of him. (*Id*.) At that time, a police officer came into Murphy's office and there was "a little altercation" between Murphy and the police officer. (*Id*.) Murphy told Jackson that he could not come back in the City Hall. (*Id*. at 21). Ms. Freeman filled out a criminal complaint but Jackson was not charged with anything and nothing else came of the incident. (*Id*. at 20-21).

### 2. Devie McLaughlin

McLaughlin began his employment with the City on May 1, 2007. [(Doc. 55-7 at 2.)] His job duties were to cut grass and pick up trash piles on the side of the road. [(Doc. 48-5 at 9.)] McLaughlin also operated the bush-hog, backhoe, and scag. (*Id*. at 25). McLaughlin asserts that he was discriminated against in his termination, discussed below, and in his pay. [(*Id*. at 27.)] Specifically, McLaughlin alleges that he gets paid less than Jeremy Kerr, yet is able to do more on the job. (*Id*. at 34). McLaughlin asserts that he is more qualified than Kerr because he can operate the heavy equipment, while

Kerr can only weed-eat.  (*Id*. at 37-38).  As a result of this, McLaughlin is stressed out. . . .  Prior to a meeting with the EEOC, McLaughlin thought he was a full-time employee.  (*Id*. at 35-36).  However, at the time of his termination and subsequent reinstatement he was classified as a part-time employee.  (*Id*. at 35).  Throughout his employment with the City, McLaughlin's pay rate has increased from $5.15 per hour to $7.40 per hour. [(Doc. 55-7 at 2)](on July 24, 2007, he received a minimum wage increase to $5.85 per hour; on October 16, 2007, he received a cost of living increase to $6.08 per hour; on July 24, 2008, he received a minimum wage increase to $6.55 per hour; on November 1, 2008, he received a cost of living increase to $6.81 per hour; on July 24, 2009, he received a minimum wage increase to $7.25 per hour; and on October 1, 2010, he received a cost of living raise to $7.40 per hour).

### 3.  Plaintiffs' Termination and Subsequent Reinstatement

Plaintiffs' termination stems from an incident concerning the watering of 38 flower pots that were hanging from street poles in Centreville, Alabama. [(Doc. 48-1 at 23-24; doc. 48-4 at 23.)]  Murphy had instructed the street crew to water the flowers every day, which Plaintiffs did, except on July 30, 2008. (*Id*.)  That morning, the street crew was called to City Hall to meet with Murphy.  [(Doc. 48-5 at 14.)]  Once Jackson, McLaughlin, and Crews arrived at City Hall, Murphy asked Jackson why they had not watered the flowers. Jackson responded that they did not water the flowers because it had rained the night before and it would be a waste of money, gas, and water to water the flowers.  [(Doc. 48-4 at 22.)]  Murphy then said the "whole crew is fired." [(*Id*.)]

Jackson left City Hall and went to the shop to gather his things that were at the shop, but did not get everything because Murphy was sitting there and said he could not take anything else.  [(*Id*. at 24.)]  Jackson came back later and was told by a Water Department employee that Murphy said that Jackson could not come back in the gate.  (*Id*.)  Jackson, McLaughlin, and Crews then went to discuss the issue with Ken Cottingham, a member of City Council.  (*Id*. at 26).  Cottingham told them there was nothing he could do about it.  (*Id*. at 27).  After talking to Cottingham, Jackson went to talk to another City Council member, Linda Renn Pierce.  (*Id*.)  During that meeting Jackson asked how they could go about getting their jobs back.  (*Id*.)  Pierce told him to write a letter to the City Council, which Jackson did two or three days later.  (*Id*. at 28).

On July 31, 2008, Plaintiffs received their paychecks, which included compensation for their accumulated vacation and sick time. [(Doc. 46-11 at 3-4.)]

On August 5, 2008, at the first meeting of City Council after Plaintiffs' termination, Cottingham told Plaintiffs to file a written grievance over their termination if they had concerns. [(Doc. 46-6 at 2)]("David Crews, Roy Jackson and Devie McLaughlin were present to ask the council why they were 'fired' by Mayor Murphy on July 30th. Ken Cottingham instructed the men that if they have concerns with the way they were terminated they need to file a written grievance to the council, who will then determine if they will hold a personnel hearing."). In that same meeting, Murphy announced that he had hired Barry McMillan as Street Superintendent. (*Id*. at 3). Ken Cottingham stated he thought that the job needed to be advertised. (*Id*.)

In a letter dated August 6, 2012, Jackson, McLaughlin, and Crews requested a meeting on why they had been fired. (Doc. 46-22)("We are requesting a meeting on why we have been fired, because if we had violated any rules the mayor of Centreville didn't warn us of any. There were no write ups or warnings of any."). On August 8, 2008, the City Council held a special meeting to address Plaintiffs' termination. [(Doc. 46-7.)] At that time, the Council voted to appoint a three person panel to hold a personnel hearing. (*Id*.) The Council also voted to reinstate Crews, Jackson, and McLaughlin to the status of suspended with pay pending the outcome of the personnel hearing. (*Id*.) Finally, the City Council voted to advertise the position of Street Superintendent. (*Id*.)

On August 11, 2008, a due process panel held a hearing. [(Doc. 46-8.)] The panel recommended (1) that Jackson, McLaughlin, and Crews "be reinstated with pay, retroactive to July 30;" (2) that Jackson receive a disciplinary writeup in his personnel file for "(a) failing to follow instructions issued by the mayor, (b) failure to properly maintain City equipment, and (c) intimidation of fellow City employee;" (3) that McLaughlin and Crews receive a written disciplinary action for failing to properly maintain City equipment; (4) that there be no further penalty and no loss of wages for the suspension period; and (5) that the employee handbook be updated to include a definition of the due process procedure, grounds for discipline, and grounds for termination. (*Id*.)

9

On August 13, 2008, the City Council held a second special meeting concerning Plaintiffs' termination. [(Doc. 46-9.)]  At that meeting the City Council voted to adopt the recommendation of the Due Process Panel and noted that the "reinstated employees should be instructed that they answer to Barry McMillan who receives his direction from Mayor Dalton Murphy." (*Id*.) The Council also voted to employ Barry McMillan on a temporary basis pending the position being posted in the paper for two weeks.  [(*Id*.)]  It was recommended that Plaintiffs report back to work on August 15, 2008.  (*Id*.)

At the next regularly scheduled City Council meeting, on August 19, 2008, two Council members, Pierce and Mack, went on the record to rescind their votes from the previous meeting in favor of placing a written reprimand in Plaintiffs' personnel files. [(Doc. 46-12.)] The City Council minutes reflect the following discussion:

> Don Mack wanted to officially go on record and rescind his motion to accept the personnel panel's recommendation.  He stated that after further investigation he feels as though the 3 workers were written up for no reason.  He further stated that the flowers did not die because they missed being watered for one day.  He added that the workers were reprimanded for not changing oil, but were not allowed to buy oil to do this with.  Mr. Mack said he thought the panel did a tremendous job but feels they were not provided with all of the facts.  Don Mack made the motion to clear the records of Roy Jackson, Devie McLaughlin and David Crews.  Linda Renn Pierce seconded the motion . . . .  Upon a vote of the members present the motion carried with a majority vote. It was further clarified to clear their record pertaining to the city and reserve the item with Roy Jackson and Teressia Freeman to be considered at a later date.

(*Id*.)

Plaintiffs returned to work and were paid for the two weeks they [had not worked]. [(Doc. 48-4 at 30; doc. 48-5 at 22.)]  However, Jackson claims he is humiliated because he has "to go to work every day and see that same guy that's in my place, in my spot, making more than me, and just come off the street and don't actually know nothing about the job, and I have to teach him, still teach him." (*Id*. at 38).  Jackson also testified that people laugh at him because of the flower incident and what he had to do to get his job back.  (*Id*.)

McLaughlin also testified that people call him "flower boy" due to him getting fired "about some flowers", which made him feel bad.  [(Doc. 48-5 at 41.)]

(Doc. 73 at 4-17 [footnotes omitted].)

## III.  DISCUSSION

**A.  CITY'S SECOND MOTION FOR SUMMARY JUDGMENT, (DOC. 52); PLAINTIFFS' MOTION TO STRIKE THE CITY'S SECOND MOTION FOR SUMMARY JUDGMENT, (DOC. 56); AND PLAINTIFFS' MOTION TO STRIKE THE AFFIDAVIT OF STEPHANIE SCOTT, (DOC. 57)**

The parties do not object to the Magistrate Judge's Recommendation that (1) the City's second Motion for Summary Judgment, (doc. 52), be "administratively terminated;" (2) plaintiffs' Motion to Strike doc. 52, (doc. 56), be denied; and (3) plaintiffs' Motion to Strike Scott's Affidavit, (doc. 57), be denied as moot.  Therefore, without objection, the court **ACCEPTS** the Recommendation of the Magistrate Judge with regard to these three Motions. An Order denying plaintiffs' Motions to Strike, (docs. 56 and 57), and denying and administratively terminating the City's second Motion for Summary Judgment, (doc. 52), will be entered contemporaneously with this Memorandum Opinion.

**B.  PLAINTIFFS' OBJECTIONS, (DOC. 76).**

**1.  City's Motion for Summary Judgment**

**a.  Termination Claims**

In this case, the Magistrate Judge held, "[T]he court cannot fathom any set of circumstances, much less the one presented here, where, absent prior knowledge of constitutional violations, the City would be liable for its failure to train its mayor about

proper employment practices.  Because there is no basis to hold the City liable under § 1983, it is entitled to summary judgment on Counts II and III."  (Doc. 73 at 29.)  Plaintiffs object to the Magistrate Judge's Recommendation that their "Section 1983 failure to train claim against the City under 42 U.S.C. § 1981 and the Equal Protection Clause of the Constitution" be dismissed.  (Doc. 76 at 2.)  They contend:

     3. As set forth in great detail in the Court's recitation of the facts and in Plaintiff's brief in Opposition to Summary Judgment,[2] Mayor Murphy's

---

    [2]In their Memorandum in Support of Their Response in Opposition to Defendants' Motions for Summary Judgment, (doc. 54), plaintiffs contended, *inter alia*:

    In this case, the City's policy of failing to respond to the plainly obvious need [to] train its Mayor and other employees on anti-discrimination practices is indicative of its deliberate indifference to the rights of its minority employees, including Plaintiffs.  The City was well aware of Murphy's racist ideology and did absolutely nothing about it.  As noted *supra*, City Clerk Stephanie Scott testified that she has heard Mayor Murphy use the word "nigger" about once a week at work in the presence of her and other administrative staff.  (Scott p. 39-41)  Scott nonetheless did not complain because, among other reasons (including fearing for her job) she was not aware that there was anyone to whom she could complain.  (Scott 48-49, 86-87)

    Councilwoman Linda Renn-Pierce heard Mayor Murphy use the word "niggers" when he referred to black people, and another council person told her Murphy referred to Councilman Mack, who is African American, as a "nigger".  (Pierce p. 12-17)  Pierce remembered Mayor Murphy using the term "nigger to describe black individuals as "damn niggers" who he thought had stolen from the City shop.  (Pierce p. 17-19, 27, 92)  Pierce had also heard Murphy mention going to a Klan rally several times.  (Pierce p. 24)

    Councilman Mack testified that Pierce had said she was tired of Mayor Murphy using racial slurs in her presence.  (Mack p. 35-36).  The prior City Clerk, Tina Litton, had told councilman Mack that Mayor Murphy "kept using

violation of Plaintiffs' constitutional rights was a highly predictable consequence of the City Council's failure to train, based on the Council's actual knowledge that the mayor regularly used the "N-word" to refer to African-Americans and that he claimed to be a member of the Ku Klux Klan. The record amply justifies a finding of deliberate indifference in the City's failure to train Mayor Murphy once it became obvious that he harbored racial animus and that he had a pattern of expressing that racial animus in the workplace through the use of racial slurs and references to his membership in the Klan.  *See Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 398 (1997).  Moreover, the record amply justifies a finding that the City's failure to train Mayor Murphy emboldened him and ratified his racist behavior, causing the Constitutional violations Plaintiffs experienced, including their racially-based termination, disparate pay, and Jackson's demotion.

    4.    Accordingly, the magistrate judge's order granting summary judgment to the City on Plaintiffs' Equal Protection and Section 1981 claims against the city should be reversed, and Plaintiffs' termination, pay discrimination, and demotion claims against the City should be allowed to reach the jury.

(*Id.* ¶¶ 3-4 [footnote added].)

---

racial slurs, the "N" word, and stuff" at work".  (Mack p. 37)  Councilmen Don Mack and Roger Kinard also knew of and discussed Mayor Murphy's use of racial slurs at work.  (Mack p. 38, 40-42, 88-89)  When a person on the Waterboard told Councilman Mack that she had heard the Mayor use the "N" word, Mack said "well, yeah, join the crowd."  (Mack p. 54)

    Despite this pervasive awareness of Mayor Murphy's racial bias, the City took absolutely no action to prevent Murphy from visiting his racist ideologies on the employees he supervised, either through training or other preventative measures.

(Doc. 54 at 58-59 [citations to page numbers in plaintiffs' Memorandum in Support of Their Response in Opposition to Defendants' Motions for Summary Judgment, (doc. 54), refer to page number assigned to the document in the court's electronic filing system].)

The Supreme Court has held that "[o]nly where a municipality's failure to train its employees[3] in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989)(footnote added). "Deliberate indifference is a stringent standard of fault requiring proof that ***a municipal actor disregarded a known or obvious consequence of his action*.*"  *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)(quotations and citations omitted; emphasis added). Therefore, to establish a § 1983 against the City based on a policy or custom of inadequate training, plaintiffs bear "the burden of proving both (1) that [the City Council] was deliberately indifferent to the need to train the [Mayor] about [employment discrimination laws] and (2) that the lack of training actually caused the [§ 1981/Equal Protection Clause] violation[s] in this case." *See id*. at 1358.

Ordinarily, deliberate indifference is established by showing "[a] pattern of similar constitutional violations by untrained employees." *Id*. at 1360. "Policymakers' continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the deliberate indifference — necessary to trigger municipal liability.  Without notice that [the municipality's chosen course] is deficient in a particular respect,

---

[3]Because the court finds employment discrimination is not a "known or obvious consequence" of the City's failure to train Murphy, the court has assumed that Murphy is a city "employee."

decisionmakers can hardly be said to have deliberately chosen a [course] that will cause violations of constitutional rights." *Id.*

The Supreme Court has noted "that a plaintiff might succeed in carrying a failure-to-train claim without showing a pattern of constitutional violations . . . in a narrow range of circumstances [in which a plaintiff shows that] a violation of federal rights may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations." *Board of County Com'rs of Bryan County v. Brown*, 520 U.S. 397, 409 (1997)(citing *City of Canton*, 489 U.S. at 390 and n.10). The narrow range of circumstances that would support a finding that inadequate training "reflected 'deliberate indifference'" include cases in which a plaintiff shows a "likelihood that the situation will recur" and "predictability that an [employee] lacking specific tools to handle that situation will violate citizens' rights." *Id.* at 409-10. In other words, the violation of citizens' rights must be a "known or obvious consequence" of the failure to train. In *Connick*, the Supreme Court explained:

> [Plaintiff] contends that the [constitutional] violation in his case was the "obvious" consequence of failing to provide specific . . . training, and that this showing of "obviousness" can substitute for the pattern of violations ordinarily necessary to establish municipal culpability.
>
> In *Canton*, the Court left open the possibility that, "in a narrow range of circumstances," a pattern of similar violations might not be necessary to show deliberate indifference. *Bryan Cty.*, [520 U.S.] at 409. The Court posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force. *Canton*, [489 U.S.] at 390, n.10. Given the known frequency with which

15

police attempt to arrest fleeing felons and the "predictability that an officer lacking specific tools to handle that situation will violate citizens' rights," the Court theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the "highly predictable consequence," namely, violations of constitutional rights. *Bryan Cty.*, [520 U.S.] at 409. The Court sought not to foreclose the possibility, however rare, that the ***unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations***.

Failure to train prosecutors in their *Brady* [*v. Maryland*, 373 U.S. 83 (1963)] obligations does not fall within the narrow range of *Canton*'s hypothesized single-incident liability. The obvious need for specific legal training that was present in the *Canton* scenario is absent here. Armed police must sometimes make split-second decisions with life-or-death consequences. There is no reason to assume that police academy applicants are familiar with the constitutional constraints on the use of deadly force. And, in the absence of training, there is no way for novice officers to obtain the legal knowledge they require. Under those circumstances there is an ***obvious need*** for some form of training.

*Connick*, 131 S. Ct. at 1360-61(emphasis added; parallel citations omitted). However, "Where the proper response . . . is ***obvious to all without training*** or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise." *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 490 (11th Cir. 1997)(quoting *Walker v. City of New York*, 974 F.2d 293, 299-300 (2d Cir. 1992), *cert. denied*, 507 U.S. 972 (1993))(emphasis added).

Plaintiffs have not argued or presented any evidence upon which the court could infer that Murphy or other City officers and employees are unfamiliar with federal laws prohibiting

16

racial discrimination in employment or that such individuals, in the absence of training, had no way to obtain that knowledge.

The law is clearly established that employment discrimination by a municipality and/or its officers on the basis of race violates Title VII, § 1981, and the Equal Protection Clause. *See Smith v. Lomax*, 45 F.3d 402, 407 (11th Cir. 1995)(The Eleventh Circuit held, "We need not engage in a lengthy discussion of the patently obvious illegality of racial discrimination in public employment [in 1989]."). The court finds that the "proper response" – race discrimination is not allowed – is obvious to all without any special training. The record does not contain evidence that the City had knowledge or notice of other complaints of race discrimination regarding Murphy's employment decisions. Although racial animus may be circumstantial proof of Murphy's intent to discriminate in the decisions at issue, the City's knowledge or notice of Murphy's racial animus, alone, does not support an inference that the City knew or should have known that he would likely make employment decisions based on race or that the City should have predicted that, without training, he would make employment decisions based on race.

Plaintiffs' objections to the Magistrate Judge's finding that the City could not be liable based on its failure to train Murphy about proper employment practices and his Recommendation that plaintiffs' § 1983 claims against the City based on failure to train be dismissed are **OVERRULED**.

17

### b. Plaintiff Jackson's Demotion Claim

Plaintiff Jackson contends that he was demoted by the City when he was reinstated to the position of Laborer when, at the time of his termination, he was acting as Street Superintendent.  (*See* doc. 73 at 41.)  The Magistrate Judge held:

> Assuming that Jackson's alleged demotion was an adverse employment decision, Jackson has not offered any evidence that similarly situated employees outside of his protected class were treated more favorably.  To the extent that he adopts the same evidence as was offered for the termination claim, that comparator evidence is simply insufficient.  First, Jackson does not point to any other employee outside his protected class that was terminated and then reinstated into the position he held in fact before.  Further, Jackson's argument that there is sufficient evidence to infer discriminatory intent, thus eliminating the need for a comparator, also does not work.  The decision to reinstate Jackson as laborer (thus effectuating his alleged demotion) was made by the City [Council].  Plaintiff has not offered any evidence showing that there was any discriminatory intent on behalf of the City [Council] when it reinstated Jackson.
>
> Further, even if Jackson were able to establish a prima facie case with respect to his demotion, he is unable to establish that there was any pretext.  It is undisputed that the City, not Murphy, was the decision-maker with respect to Jackson's reinstatement.  Thus, the question is  whether the decision by the City to reinstate Jackson was tainted with racial animus.  Plaintiff does not offer any evidence that there was discriminatory intent on behalf of the City [Council].   The pretext evidence offered in this case relates solely to Defendant Murphy, who was not the decision-maker with respect to Jackson's demotion. Accordingly, any discrimination claim based on disparate treatment towards Jackson in his demotion must fail.

(Doc. 73 at 41-42 [footnote omitted].)

Plaintiffs object to the Magistrate Judge's finding that the City was the decision-maker with regard to Jackson's demotion, arguing "that although the City Council decided to reinstate Jackson, Mayor Murphy, who had already filled Jackson's former Street

Superintendent position, effectively made the decision to reinstate and demote Jackson into a Laborer position." (Doc. 76 at 4.) They argue, "The record additionally supports an inference that Mayor Murphy, out of discriminatory animus, hid from the City Council the fact that he had promoted Jackson to Street Superintendent in the first place, preventing the City Council from returning Plaintiff Jackson to the Superintendent position and resulting in his demotion." (*Id*. at 4-5.) This evidence, they contend, creates a jury question as to whether "Mayor Murphy acted as the City's 'cat's paw,' making the City liable for Plaintiff Jackson's demotion 'because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision.'" (*Id*. at 5 [quoting *Staub v. Proctor Hospital*, 131 S. Ct. 1186, 1193 (2011)].)

"[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue;" "[r]espondeat superior or vicarious liability will not attach under § 1983." *City of Canton*, 489 U.S. at 385(citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694-95 (1978)). Therefore, "the cat's paw theory does not apply in the § 1983 context." *Files v. DeKalb County School Dist.*, 2012 WL 716055, *3-*4 (N.D. Ga. , 2012); *see also Waters v. City of Chicago*, 580 F.3d 575, 586 n.2 (7th Cir. 2009)("Imputing a nondecisionmaker's motive to a municipal employer sounds a lot like respondeat superior liability. Given that well developed § 1983 municipal liability law recognizes delegation and ratification, there seems to be little point in trying to awkwardly fit the cat's paw concept in this area of civil rights law.").

19

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.   Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Monell*, 436 U.S. at 694-95.

According to the Magistrate Judge's Report, Murphy told Jackson that  Jackson was the Street Superintendent after the prior Street Superintendent, Randy Hudgins, left.  (Doc. 73 at 10.)  Thereafter, Jackson performed the duties of Street Superintendent, although he was never officially given the title of Street Superintendent in his personnel record.  (*Id*. at 10-11.)  In personnel documents, he remained classified as a Laborer.  (*Compare* doc. 46-16 [Jackson's "position and classification" noted as "Street Dept."] *with*  doc. 46-13 [McMillan's "classification" noted as "Street Supt."].)  After Jackson's termination, the City "reinstated [him] with pay;" therefore, he was placed in the position he had at the time he was terminated, which, according to his personnel records, was Laborer.  (*See* doc. 73 at 15-16.)  Jackson has not argued that he told the Due Process Panel or the City Council that he had been terminated from the position of Street Superintendent; he has not presented any evidence that he applied for the position of Street Superintendent while it was posted following his reinstatement as a Laborer.  Plaintiff cannot show that the City, through the actions of the City Council, discriminated against him on the basis of his race by reinstating him to the position of Laborer without some evidence that the City Council knew that

Murphy had promoted Jackson to Street Superintendent and knew that Jackson had held that position, as opposed to the position of Laborer, at the time of his termination.

Plaintiffs' objections to the Magistrate Judge's Recommendation that Jackson's demotion claim against the City be dismissed are **OVERRULED**.

### c.  Title VII Claims

The Magistrate Judge found that the City was not an employer for purposes of Title VII.  Plaintiffs do not object to this finding.  (Doc. 76 at 2.)  Therefore,  the court **ACCEPTS** the Magistrate Judge's Recommendation that the Motion for Summary Judgment filed by defendant City be granted and plaintiffs' Title VII claims be dismissed.

### 2.  Murphy's Motion for Summary Judgment

Plaintiffs object to the Magistrate Judge's recommendation that Jackson's claim of racial discrimination with regard to his demotion to Laborer against Murphy should be dismissed on the ground that Murphy was not the "decisionmaker" with regard to Jackson reinstatement.  (Doc. 76 at 4.)  They contend, "Contrary to the [Magistrate Judge's] reasoning, the facts . . . support a reasonable inference that although the City Council decided to reinstate Jackson, Mayor Murphy, who had already filled Jackson's former Street Superintendent position, effectively made the decision to reinstate and demote Jackson into a Laborer position, entitling Plaintiff to a jury trial given the ample circumstantial evidence creating a triable issue concerning Murphy's discriminatory intent."  (*Id*. at 4.)

21

The court finds no reason to sustain plaintiffs' objections regarding Jackson's demotion claim.  The adverse decision causing Jackson's demotion, if any, was Murphy's failure to officially promote plaintiff Jackson to the position of Street Superintendent.  This failure to change the official personnel records resulted in Jackson being "reinstated" to the position of Laborer, a decision made by the City Council without the recommendation of Murphy or any other input from him.  The City Council did not consider Murphy's decision to hire a Street Superintendent after he had fired Jackson in deciding whether to reinstate Jackson to the Laborer position.  Jackson was reinstated to a Laborer's position because that was the position he held at the time he was terminated according to his personnel records.  His records did not show that Murphy had promoted him to Street Superintendent, and, apparently, he never told the City Council that he was being reinstated to the wrong position.  Therefore, the court accepts the Magistrate Judge's findings that (1) "the decision to reinstate Jackson ***as [a] laborer*** (thus effectuating his alleged demotion) was made by the City Council," and (2) "[i]t is undisputed that the City, not Murphy, was the decision-maker with respect to Jackson's reinstatement."  (Doc. 73 at 42 [emphasis added].)

Plaintiffs' objections regarding the Magistrate Judge's Report and Recommendation that Jackson's demotion claims against Murphy be dismissed are **OVERRULED**.

22

## C.  DEFENDANT MURPHY'S OBJECTIONS, (DOC. 77).

### 1.  Mayor as "Final Decisionmaker"

Murphy contends that the § 1983 claims against him should be dismissed because he was not the final decisionmaker with regard to pay or termination decisions.  (Doc. 77 at 2.) In support of his Objection, Murphy quotes *Maschmeier v. Scott*, 269 Fed. Appx. 941, 943-44 (11th Cir. 2008).  (Doc. 77 at 3.)

In *Maschmeier*, the Eleventh Circuit rejected ***official capacity*** claims based on the fact that the decisionmaker was not the ***final policymaker***.  *Maschmeier*, 269 Fed. Appx. at 943 ("Maschmeier filed suit against Scott in his official capacity as Sheriff of Lee County only."); *id*. at 944 ("[W]e find that the sheriff's termination decisions are subject to meaningful administrative review, and Scott[, the sheriff,] thus cannot be the final policymaker.  Because Scott was not the final policymaker in regard to Maschmeier's termination, Maschmeier's § 1983 claims must fail.").

With regard to claims against decisionmakers in their individual capacity, the determination of who is a final policymaker is not necessarily relevant.  As the Supreme Court explained:

> [O]fficial-capacity suits "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'"  [*Kentucky v. Graham*, 473 U.S. 159, 165 (1985)] (quoting *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n.55 (1978)).  Suits against state officials in their official capacity therefore should be treated as suits against the State.  473 U.S., at 166.  Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.  See Fed. Rule Civ. Proc. 25(d)(1); Fed. Rule App. Proc.

23

43(c)(1); this Court's Rule 35.3.  Because the real party in interest in an official-capacity suit is the governmental entity and not the named official, "the entity's 'policy or custom' must have played a part in the violation of federal law."  *Graham*, *supra*, at 166 (quoting *Monell*, *supra*, 436 U.S., at 694).  For the same reason, the only immunities available to the defendant in an official-capacity action are those that the governmental entity possesses. 473 U.S., at 167.

       Personal-capacity suits, on the other hand, seek to impose individual liability upon a government officer for actions taken under color of state law.  Thus, "[o]n the merits, to establish personal liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."  *Id.*, at 166.  While the plaintiff in a personal-capacity suit need not establish a connection to governmental "policy or custom," officials sued in their personal capacities, unlike those sued in their official capacities, may assert personal immunity defenses such as objectively reasonable reliance on existing law.  *Id.*, at 166-167.

*Hafer v. Melo*, 502 U.S. 21, 25 (1991)(parallel citations omitted).  "***Municipal*** liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered."  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)(emphasis added).  No such limitation applies to individual liability; "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right."  *Hafer*, 502 U.S. at 25 (quoting *Graham*, 473 U.S. at 166); *see also Quinn v. Monroe County*, 330 F.3d 1320, 1326-28 (11th Cir. 2003)(explaining the differences between a policymaker and a decisionmaker for purposes of establishing individual liability).

In this case, Murphy decided raises and set starting pay for employees of the Street Department and he decided to terminate them.  The decisions were effective immediately; therefore, he was the decisionmaker.  However, the City Council had the power to review

and reverse Murphy's decisions; therefore, Murphy was not a final policymaker with regard to employment decisions.  Assuming Murphy decided to terminate plaintiff because they were African-American employees and he decided to pay white employees more than African-American employees doing the same work, he can be liable in his individual capacity.  However, because he was not the final "policymaker," his termination and pay decisions, even if discriminatory, would not be the basis for the City's liability.  He would be liable for his discriminatory decisions, but the City would not be liable for a practice or custom of discrimination.

Murphy's Objections to the Magistrate Judge's finding that he can be liable in his individual capacity as a decisionmaker, despite the fact that he was not the final policymaker, are **OVERRULED**.

### 2.  Pay Discrimination Claims

Murphy objects to the Magistrate Judge's finding that plaintiffs' Amended Complaint contains a claim of pay discrimination against Murphy in his individual capacity.  (Doc. 77 at 7.)  In their Amended Complaint, plaintiffs allege:

> 14.  Jackson held the position of Street Superintendent from around 2005[4] until July 30, 2008, and his salary reached $8.25 an hour in that position.

---

[4]The payroll records for the time indicate that Hudgins worked for the City in September 2007 but not in October 2007.  (Doc. 46-5 at 9-10.)  The Magistrate Judge found that Jackson started performing the job of Street Superintendent after Hudgins left the position.  (Doc. 73 at 10.)  When Jackson began performing the job of Street Superintendent is not material to this court's ruling on the parties' Objections.

. . .

18.  The day Mayor Murphy fired Jackson, Mayor Murphy hired Barry McMillan, a white male, as the new Street Superintendent and paid him $10.00 an hour.

. . .

25.  McLaughlin's pay reached $6.08 an hour by the time Mayor Murphy fired him in July 2008.

. . .

27.  Upon his return, McLaughlin learned that Defendants paid his white co-worker, Kerr, who was hired six months after McLaughlin, $7.00 an hour.

. . .

32.  During their employment, Defendants discriminated against Plaintiffs because of their African-American race by disciplining them, discharging them and paying them lower wages than white employees holding the same position in violation of 42 U.S.C. § 2000e, et seq., as amended.

. . .

37.  Defendants have discriminated against Plaintiffs on the basis of their race by denying them the same rights as are enjoyed by white persons in the making, performance, modification, and termination of their contracts, specifically in their employment relationship with Defendants and the enjoyment of all benefits, privileges, terms, and conditions of that relationship, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981, as amended.

. . .

43.  42 U.S.C. § 1983 provides that any person acting under color of State law who deprives any other person of rights guaranteed by the constitution or laws of the United States shall be liable to the injured party in an action for legal or equitable relief.

26

     44.  The discriminatory and retaliatory actions of Defendants described in this Complaint were taken under color of State law. Defendants' actions, as stated in this Complaint, constitute purposeful discrimination and retaliation and are arbitrary and capricious.  As such, Defendants have deprived Plaintiffs of their rights to equal protection under the Fourteenth Amendment to the United States Constitution.

(Doc. 6 ¶¶ 14, 18, 25, 27, 32, 37, 43-44 [footnote added].)

These allegations state a discriminatory pay claim against Murphy in his individual capacity.  "Notice pleading requires the plaintiff to set forth in his complaint *claims for relief*, not causes of action, statutes or legal theories."  *Alvarez v. Hill*, 518 F.3d 1152, 1157 (9th Cir. 2008)(citing Fed. R. Civ. P. 8(a)(2))(emphasis in original).

The Federal Rules of Civil Procedure require only that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief, and a demand for judgment for the relief the pleader seeks."  Fed. R. Civ. P. 8(a).  "A complaint need not specify in detail the precise theory giving rise to recovery.  All that is required is that the defendant be on notice as to the claim being asserted against him and the grounds on which it rests."  *Sams v. United Food & Comm'l Workers Int'l Union*, 866 F.2d 1380, 1384 (11th Cir.1989); *see also Dussouy v. Gulf Coast Investment Corp.*, 660 F.2d 594, 604 (5th Cir.1981)("The form of the complaint is not significant if it alleges facts upon which relief can be granted, even if it fails to categorize correctly the legal theory giving rise to the claim.").

*Evans v. McClain of Georgia, Inc.*, 131 F.3d 957, 964 n.2 (11th Cir. 1997).  "A plaintiff is not required to set forth a legal theory to match the facts, so long as some legal theory can be sustained on the facts pleaded in the complaint."  *O'Grady v. Village of Libertyville*, 304 F.3d 719, 723 (7th Cir. 2002)(citing *Wudtke v. Davel*, 128 F.3d 1057, 1061-62 (7th Cir. 1997)).  "Well-pleaded facts, not legal theories or conclusions, determine the adequacy of

the complaint." *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009)(internal quotations and alterations omitted).

Plaintiffs' Amended Complaint adequately states a claim for relief against Murphy in his individual capacity for discriminatory pay decisions. Murphy's Objections to the Magistrate Judge's Recommendation that his Motion for Summary Judgment should be denied as to plaintiffs' pay claims are **OVERRULED**.

### 3. Termination was not Adverse Employment Action

Murphy objects to the Magistrate Judge's finding that the plaintiffs' terminations constituted actionable adverse employment actions. (Doc. 77 at 7.) In essence, Murphy contends that, because the City Council reinstated plaintiffs before they suffered any loss or delay in their pay, plaintiffs cannot prove their terminations were adverse employment actions. (*Id.* at 7-8 [citing *Crittenden v. International Paper Co.*, 214 F. Supp. 2d 1250 (M.D. Ala. 2002)].)

In the Eleventh Circuit, a plaintiff claiming intentional employment discrimination establishes an adverse employment action by proving either "an ultimate employment decision" *or* "a serious and material change in the terms, conditions, or privileges or employment." *Crawford v. Carroll*, 529 F.3d 961, 970-71 (11th Cir. 2008)(citing, *inter alia*, *Stavropoulos v. Firestone*, 361 F.3d 610, 616-17 (11th Cir. 2004) and quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1239 (11th Cir. 2001)(emphasis omitted)). A termination is an "ultimate employment decision." *Id.* (quoting *Stavropoulos*, 361 F.3d at 617). Therefore,

plaintiffs may pursue discrimination claims based on their terminations without showing that

they suffered monetary losses because of their terminations.

Defendant Murphy's Objections to the Magistrate Judge's finding that plaintiffs'

terminations were actionable adverse employment actions are **OVERRULED**.

### 4.  Evidence Not Sufficient to Prove Intentional Race Discrimination

The Magistrate Judge held:

Because Plaintiffs cannot show that a similarly situated employee outside their
protected class  was treated more favorably, they cannot establish their case
through McDonnell Douglas.

. . .

As an alternative to *McDonnell Douglas*, Plaintiffs can also present
sufficient "'circumstantial evidence [to create] a triable issue concerning the
employer's discriminatory intent.'"  *Hamilton v. Southland Christian Sch.*,
Inc., 680 F.3d 1316, 1320 (11th Cir. 2012)(quoting *Smith v. Lockheed-Martin
Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)).  "A triable issue of fact exists
if the record, viewed in the light most favorable to the plaintiff, presents
enough circumstantial evidence to raise a reasonable inference of intentional
discrimination."  *Id*.  Plaintiffs argue that they have submitted sufficient
evidence to do just that.   (Plaintiffs' Response, Doc. 54 at 39-46).
Specifically, Plaintiffs point to the facts that they were fired for failing to water
the flowers, even though it had rained the night before; that the City Council
rejected Murphy's reasons for terminating Plaintiffs and promptly voted to
reinstate them without taking any other disciplinary action; and the volume of
evidence demonstrating Murphy's racial animus.  The court agrees that the
above evidence, when considered together, is sufficient to raise a reasonable
inference of intentional discrimination.

To be clear, because Mayor Murphy's racial comments were unrelated
to the employment decision, those comments are not sufficient to create a
reasonable inference of intentional discrimination on their own.  *See Ross v.
Rhodes Furniture, Inc.*, 146 F.3d 1286, 1291-92 (11th Cir. 1998) (finding that
when racial remarks are submitted as evidence of pretext, but are not direct

evidence of discrimination because they are either too remote in time or too attenuated, they may provide circumstantial evidence that, when read in conjunction with the entire record, show a decision-maker's discriminatory attitude).  However, when viewed in conjunction with the fact that the City Council promptly reinstated Plaintiffs without any negative remarks in their personnel files, a reasonable inference that the termination was racially motivated is created.  The reasonable inference being that by reinstating Plaintiffs, the City Council found that Murphy's stated reasons for termination were invalid.  When combined with the evidence of Murphy's racist comments, it is reasonable to infer that Murphy in fact fired Plaintiffs because of their race.

(Doc. 73 at 39-41 [footnotes omitted].)

Murphy objects to the Magistrate Judge's finding that plaintiffs presented sufficient circumstantial evidence that to establish a prima facie case of race discrimination or to show that his articulated reasons were pretextual.  (*See* doc. 77 at 9-14.)  He contends:

Initially, the Court correctly held there was no proper similarly situated comparator upon which to base a discrimination *prima facie* case regarding termination.[5]  However, the Court incorrectly held that other circumstantial

_____

[5]Although neither party objects, the court rejects the Magistrate Judge's finding that Jackson cannot establish a prima facie case of employment discrimination "[b]ecause [he] cannot show that a similarly situated employee outside [his] protected class was treated more favorably."  (*See* doc. 73 at 39.)  A plaintiff can establish that his employer treated similarly-situated employees outside his protected class more favorably by showing ***either*** that he was disciplined more harshly than one outside the protected class for nearly identical conduct ***or*** that he was "replaced by one outside the protected class." *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984).  Although Jackson has not demonstrated that he was disciplined more harshly than a similarly-situated white employee, the Magistrate Judge found that Murphy hired a white employee, Barry McMillan, as Street Superintendent, the job plaintiff Jackson was performing at the time of his termination, after he fired Jackson.  (*See* doc. 73 at 16 and n.25, 41, 46-47.)  This is sufficient evidence to support a finding that Murphy replaced Jackson, an African-American employee, with McMillan, a white employee. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987); *Hawkins v. Ceco Corp.*, 883 F.2d 977, 983-84 (11th Cir.1989).  This is sufficient

evidence was sufficient to create a question of fact regarding race discrimination.  The record, taken as a whole and even in the light most favorable to Plaintiffs, does not support a finding that pretext has been established regarding the reasons Plaintiffs were terminated.  Moreover, the Court's recommended opinion ignores the undisputed facts that (1) Murphy recruited Jackson and hired Jackson then later his brother, McLaughlin; (2) Murphy gave Jackson numerous raises; (3) Murphy was chastised for attempting raises for Jackson; (4) Jackson never heard Murphy tell a racially derogatory joke or use the "n" word; (5) McLaughlin has no complaints about treatment other than being called ["]boy["]  and the record is clear that this was rare (Jackson says 5 times in 3 or more years) and that Murphy referred to all the street crew as "boys".  . . .  The evidence regarding Murphy's alleged propensity to make racially derogatory comments initially causes pause.  But at the end of the analysis, there is a complete lack of connective evidence regarding Mayor Murphy getting mad and firing the whole crew at work that day, and the attempt to prove he did it because Plaintiffs were black; in short, it simply makes no sense.  Regardless of how inappropriate Mayor Murphy's alleged comments were, they are not evidence sufficient to establish a *prima facie* case of race discrimination or sufficient to qualify as enough pretext evidence, such that Plaintiffs can survive summary judgment.

(*Id*. at 8-10 [footnote added].)

"Discriminatory motive may be proved by direct evidence of the [decisionmaker's] racially discriminatory attitude[ ] regardless of whether it relates to the employment decision at issue.  *EEOC v. Beverage Canners, Inc.*, 897 F.2d 1067, 1071 n.9 (11th Cir. 1990).  However, this "direct evidence" must be "evidence from which a reasonable trier of fact could find, more probably than not, a causal link between an adverse employment action and a protected personal characteristic.  *Wright v. Southland Corp.*, 187 F.3d 1287, 1298, 1300 (11th Cir. 1999).

---

to satisfy the prima facie showing for Jackson's termination claim.

31

The record contains evidence that Murphy had used racially-derogatory epithets to refer to African-Americans on numerous occasions and he referred to his membership in the Ku Klux Klan.  These incidents are evidence of Murphy's racially-discriminatory attitude.

Viewing the evidence in the light most favorable to plaintiffs, the non-moving parties, a reasonable jury could find that Murphy had no legitimate reason to fire the plaintiffs. Considering evidence of Murphy's discriminatory attitude, together with evidence on which a reasonable jury could find that Murphy knew he had no cause to terminate plaintiffs, the court finds the evidence is sufficient to allow a reasonable jury to find a causal link between an adverse employment action – plaintiffs' terminations – and a protected personal characteristic – plaintiffs' race. *Wright*, 187 F.3d at 1298.

Murphy's Objections to the Magistrate Judge's finding that "it is reasonable to infer that Murphy in fact fired Plaintiffs because of their race," (doc. 73 at 41), are **OVERRULED**.

### 5.  Insufficient Evidence of Discrimination as to Pay Claims

Murphy objects to the Magistrate Judge's finding that "there was a discriminatory intent regarding rate of pay even if Mayor Murphy could be considered a decision maker." (Doc. 77 at 14.)  Specifically, Murphy contends, "The Court ignored the evidence about white comparators being paid less than McLaughlin and created reasons the distinctions were not relevant (in comparing white employees allegedly similarly situated) based on facts not

32

argued by Plaintiffs and not otherwise supported by the record." (*Id.*) Murphy does not cite to any specific record evidence it contends the Magistrate Judge ignored.

The court has carefully reviewed and considered de novo all the materials in the court file, including, but not limited to, the Report and Recommendation and the parties' summary judgment submissions. Based on this review of the record, viewing the evidence in the light most favorable to plaintiffs, the court finds Murphy's objections to the Magistrate Judge's Report and Recommendation regarding plaintiffs' pay claims are **OVERRULED**. Murphy's evidence may be sufficient to allow a reasonable jury to find in his favor on plaintiffs' pay claims; however, it does not compel such a finding.

## <u>CONCLUSION</u>

For the foregoing reasons, the court **OVERRULES** the parties' Objections to the Report and Recommendation, (docs. 76 and 77); the Magistrate Judge's Report is **ADOPTED** and his Recommendation is **ACCEPTED**. Contemporaneous with the entry of this Memorandum Opinion, the court will enter an Order granting the Motion for Summary Judgment filed by the City of Centreville, (doc. 46); granting in part and denying in part the Motion for Summary Judgment filed by Murphy, (doc. 47); denying and administratively terminating the City's second Motion for Summary Judgment, (doc. 52); denying plaintiffs' Motion to Strike the City's second Motion for Summary Judgment, (doc. 56); and denying as moot plaintiffs' Motion to Strike the affidavit of Scott, (doc. 57).

**DONE**, this 24th day of September, 2012.

SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE